IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff

v.

SALVI BENITEZ AVILA [1],

Defendant.

CRIMINAL NO. 05-381 (JAG)

## REPORT AND RECOMMENDATION

### INTRODUCTION

On February 10, 2006, defendant Salvi Benítez Avila filed a Motion to Suppress Out-of-Court Identifications and Leave to File Exhibits (**Docket Nos. 51, 52**).   Thereafter, the government filed its Response to defendant's Motion to Suppress (**Docket No. 57**).   The issue was referred to the undersigned Magistrate Judge for report and recommendation. **(Docket Nos. 55, 56**).

Defendant is charged with the assault and robbery of a foreign official on August 4, 2005, in violation to Title 18, United States Code, sections 112(a) and 371.   Defendant requests to suppress the identification by the victim at a line-up conducted by the Puerto Rico Police on October 19, 2005, wherein defendant was identified by the victim from a group of four other individuals.   Defendant submits the identification process was tainted because the other four individuals were uniformed Puerto Rico Police officers, who by Puerto Rico Police Department regulations are not allowed to wear beards or goatees, and same were pencil-painted or pencil-drawn to resemble defendant.   As such, defendant questions, for purposes of suppression of the identification, the level of certainty demonstrated by the witness at the confrontation, as well as

United States v. Salvi Benitez Avila
Criminal No. 05-381 (JAG)
Report and Recommendation
Page No. 2

the length of time between the crime and the confrontation.   Defendant is not, however, questioning the opportunity the witness had to view the suspect of the crime, her degree of attention or the accuracy of the witness' prior description of the suspect. *See* Motion to Suppress, p. 7.

## FACTUAL AND PROCEDURAL BACKGROUND

Upon the court's referral of above defendant's Motion to Suppress, an evidentiary hearing was held on May 1, 2006, wherein the defense submitted the testimonies of Puerto Rico Police Officer Israel Casillas, Juan Carlos Jiménez-Torres and Denisse Vega-Rivera.   The government presented Puerto Rico Police Officer Emanuel Martínez-Martínez and Mrs. Adriana Bolaños, the victim, as witnesses.

### A.   Defendant's Witnesses.

Puerto Rico Police Officer Israel Casillas Medina, from the Carolina South Area, testified that on August 4, 2005 he participated in interviewing the victim, Mrs. Adriana Bolaños, about a robbery at a Total Gas Station at Road No. 3.  The victim, who at the time of the interview was nervous and anxious, had been accompanied at the gas station by her step-daughter and husband.  She described one of the assailants as a white, 5' 5" male individual, with blue sport shirt with the number of a team, wearing blue pants.  He had black hair, short, about 110 pounds.  Mrs. Bolaños described the assailant as having in his possession a long black rifle. Apparently, under intimidation, the assailant took the victim's Louis Vuitton purse which contained approximately $8,000, her identification documents as consul of Costa Rica in Puerto Rico, personal property and passport, social security card, airport identification card and left thereafter through the back part of the establishment.  Mrs. Bolaños could not identify the

United States v. Salvi Benitez Avila
Criminal No. 05-381 (JAG)
Report and Recommendation
Page No. 3

second assailant.  The area where the victim saw her assailant was semi-light/semi-dark, on a flat cement surface.  Officer Casillas took notes of the interview and he prepared a report about two to three hours after the interview.

Mr. Juan Carlos Jiménez-Torres testified he is employed at Borders at Plaza Las Américas and he is a 5' 5" male individual who weights 135-140 pounds.  Defendant (who, as proffered by defense counsel, weighs 185 pounds and is 5' 10") stood besides Jiménez-Torres to demonstrate to the Court the difference between both individuals.

Ms. Denisse Vega-Rivera, defendant's common-law wife, testified that on October 19, 2005, she went to the Police station with her husband for a line-up.  At that time, she observed four Police officers dressed in their uniforms with blue pants and shirts and black shoes.   None of the Police Officers had facial hair, either moustache or beards, and were taller than defendant.  When defendant was taken for the line-up, Ms. Vega Rivera, who did not see the actual line-up, observed all four officers -who participated in the line-up with defendant– coming out with a pencil-painted moustache to resemble the defendant and wearing a blue coat on top of their uniforms.  Ms. Vega-Rivera averred that she could distinguish the facial hair of the police officers as painted.

On cross-examination, Ms. Vega-Rivera admitted all the Police Officers who participated in the line-up looked like her husband Salvi.  Showing to this witness the photograph used as Exhibit 1, she testified she could not identify from the photograph which of police officers had a painted moustache.  Ms. Vega-Rivera indicated the four police officers and defendant were all dressed in the same clothes at the time of the line-up.  She also stated she never saw the victim, Mrs. Bolaños, while she (Vega-Rivera) was waiting during the preparations of the line-up.

United States v. Salvi Benitez Avila
Criminal No. 05-381 (JAG)
Report and Recommendation
Page No. 4

**B.    Government's Witnesses.**

The government presented Puerto Rico Police Officer Emanuel Martínez-Martínez and
Mrs. Adriana Bolaños, the victim, as witnesses.

Puerto Rico Police Officer Martínez, who formerly worked at the Robbery Division of the
Puerto Rico Police, Carolina Area, testified he was assigned this case to investigate.  The victim,
Mrs. Bolaños, was interviewed on August 9, 2005.  She indicated that, upon getting out of the
gas station and while she turned off her car alarm, an individual with a long barrel weapon
approached her and demanded her handbag.  She described an individual who was 5' 8" to 5'
9" tall.  Mrs. Bolaños does not know the measurements used in Puerto Rico as feet and inches
because she uses centimeters.  The individual was approximately 20-21 years old.  Officer
Martínez used himself as an example since he is 5' 10" in height and asked Mrs. Bolaños to
compare him to the assailant.  Mrs. Bolaños indicated the individual was just a little less in
height, and thus, Officer Martínez inferred the assailant must have been 5' 8" or 5' 9".  The
assailant was described as having a light dark skin complexion and was skinny.   Mrs. Bolaños
indicated she would be able to identify the individual since he threatened her with the weapon
for quite a while.  A supplementary report of the victim's interview was prepared.

Agent Martínez  was the person responsible of arranging the line-up on October 19,
2005.  He followed the state Rule of Criminal Procedure 252, which requires the participation
of at least four other individuals and the suspect, with similar characteristics as to race, color, sex
and, if possible, height and weight, to safeguard the rights of the suspect. All those participating
in the line-up in question were dressed similarly in blue overalls, having white shoe covers or
booties covering their feet, the same ones used at crime scenes.  Exhibit A. Officer Martínez

United States v. Salvi Benitez Avila
Criminal No. 05-381 (JAG)
Report and Recommendation
Page No. 5

recalls that in this particular case, all shoes were covered.  Officer Martínez indicated Police

officers are mostly used during line-ups because civilians are reluctant to cooperate in these

activities and the Police officers are required to do so.  State Police agents are not allowed to

wear moustache or beards pursuant to Police regulations, but Agent Martínez is not aware that

the general public is aware of this situation.  Therefore, facial hair is replicated on police officers

participating in a line-up to replicate the suspect's facial hair to safeguard his rights during

identification proceedings.

Officer Martínez further testified the victim remained at the Robbery Division, the second

floor of the CIC Division, while the preparations for the line-up were done and she was not

allowed to see the line-up until it was ready.  Officer Martínez explained the suspect was allowed

to pick the identification number he was going to use at the line-up and defendant picked

number "3."  Defendant was also allowed to choose the position he was going to stand in the

line-up and defendant chose the middle position.  Minutes of the line-up proceedings were kept.

Exhibit 2.[1]  Officer Martínez looked for the following components in the Police Officers who

participated in the line-up with defendant: resemblance in sex, race, color, and physical aspect

(height and weight) of defendant.

Officer Martínez instructed Mrs. Bolaños, the victim, that there would be five individuals

at the line-up wearing numbers and the suspect not necessarily would be present at the line-up.

Mrs. Bolaños was instructed to state the individual's number if she was certain of the

identification and not to say a participant of the line-up was similar to or resembled the suspect.

---

[1] The proper translation of Exhibit 2 was submitted by the government.

United States v. Salvi Benitez Avila
Criminal No. 05-381 (JAG)
Report and Recommendation
Page No. 6

Thus, the suspect was either present at the line-up or not. The person making the identification stands behind a one way glass window and can see the individuals about 1½ to 2 feet away from the window. The distance from the window to the back of the room where these individual stand is about 6' 9½" and the distance from the victim about 9 to 10 feet away. In this particular case, about thirty seconds passed, after the window vertical blinds were pulled up, for Mrs. Bolaños to observe the individuals and identify defendant, without hesitation or doubt. Thereafter, she became quite nervous.

On cross-examination, Officer Martínez indicated he used in this case the same line-up procedure which is used in other cases. Efforts to find civilians to participate in the line-up were unsuccessful so Police Officers were used. Officer Martínez testified the booties used to cover the shoes of the participants of the line-up are always used and they are readily available at the Robbery Division. Exhibit A. Officer Martínez stated that, some days before the line-up, Mrs. Bolaños was shown photographs at a computer in the data base of the Technical Services Division of the Police Department but she failed to identify anyone as the suspect.

Mrs. Adriana Bolaños, the General Consul of Costa Rica in Puerto Rico for the last two years and the victim object of the robbery, testified at the evidentiary hearing. Mrs. Bolaños' job entails recognizing immigrants through photographs for visa purposes for which she considers her diplomatic duties allow her to have a good recollection of events and of the faces of different persons. She described herself as having a photographic memory.

The date of the robbery Mrs. Bolaños went with her husband and step-daughter, around 6:30 - 7:30 p.m., to the Total Gas Station in 65th Infantry Avenue, which is owned by her husband. They decided to visit the gas station after receiving a call from an employee that there

United States v. Salvi Benitez Avila
Criminal No. 05-381 (JAG)
Report and Recommendation
Page No. 7

was going to be a shortage of regular gas at the time.  Her husband was outside trying to

coordinate the traffic of people attempting to get gas at the station because of the upcoming

shortage.  Mrs. Bolaños decided to help out and went to the business safe deposit box counted

the money and placed some cash money inside her handbag.  After spending some time at the

small store at the gas station, she exited the same with her step-daughter thinking that her

husband would be waiting for them in the car but he was still directing the traffic. While waiting

for him on the sidewalk, Mrs. Bolaños looked towards the gate at the left side of the gas station

where she saw an individual opening the gate.  The individual was holding a firearm and

walking towards her.  A second person came behind the individual but she did not look at this

person since she was paralyzed looking at the first individual.  The first individual was kneeling

down when the gate was opened and started running towards her while carrying the firearm.

Her step-daughter ran off. The individual approached Mrs. Bolaños and grabbed her by the left

arm, and demanded her purse on several occasions.  Mrs. Bolaños at that time thought of

throwing her purse inside a pick-up truck which was near by.  She then finally agreed to

surrender her purse.  The alarm of the vehicle suddenly went off and her husband looked and

turned towards her.   Some time elapsed between the time the individual got near her, asked

for the handbag on several occasions, and when she finally surrendered him the purse.  Mrs.

Bolaños thereafter called 911 and by the time the Police arrived to the scene, she had already

cancelled her credit cards.

Mrs. Bolaños had a face to face confrontation with the suspect which she described as

not being "an instant."  She indicated that time slowed down at that moment and she knows

with certainty the time did not go fast.

United States v. Salvi Benitez Avila
Criminal No. 05-381 (JAG)
Report and Recommendation
Page No. 8

Initially, the Police officers asked Mrs. Bolaños about what had happened and did not ask for a physical description of the assailant.  She was told to pick-up a copy of the complaint the following week and noticed then there was need to make several corrections because no reference was made to her handbag, a Louis Vuitton she could recognized because of some particulars, her coin purse also a Louis Vuitton, the Social Security card, passport and the documents inside her purse not being mentioned.  She never received a corrected version of the complaint.

Mrs. Bolaños recalls providing the height of the individual in centimeters, approximately 164 centimeters, being considered somewhat taller than she is since they were basically eye to eye and she did not need to lift up her head to look at him.  She was wearing at the time 7 to 8 centimeters high platform shoes.

The robbery took place on a Thursday, but by the next Saturday Mrs. Bolaños saw the same individual again when she went to the gas station to buy some milk.  She parked her car really close because she was afraid.  The individual was walking on the sidewalk and once he saw her he stood there and she saw him eye to eye.  She called the cashier to inquire about the person wearing a cap but no one entered the gas mini market area and could only speculate that the individual was there because he had the keys to the car.  The individual did not do anything to her on this Saturday.  She told her husband and the agents about seeing the individual that Saturday. She never saw the individual again until the line-up on October 19, 2005.  Prior to the line-up, she had visited the police station to see photographs of suspects but had not identified anyone.

On the date of the line-up, Mrs. Bolaños went to the office of the CIC and waited with her husband in the waiting area of the Director's Office in the second floor. Mrs. Bolaños was notified there were going to be several individuals with different numbers hanging from a chain around their necks and it was not certain that the suspect would be included among them. If she had the minimum doubt, she was instructed not to point to anyone. If she wanted to hear them speak, they would all state the same words and if she wanted to look at them closer, they would all take one step forward. All the participants of the line-up wore jumpers of the same light color. Mrs. Bolaños does not remember looking at their shoes. Mrs. Bolaños does not recall noticing any facial hair on the faces of the participants of the line-up. Mrs. Bolaños made an identification of the assailant without any doubt, as number three (3), the number selected by the herein defendant. She looked at the faces during the line-up and had no doubt whatsoever as to who the individual who had robbed her was, being her only concern if she had to wait to identify him or if she could identify him right away. Additionally, Mrs. Bolaños indicated having no doubt as to identifying defendant in-court at the evidentiary hearing before this Magistrate Judge.

Upon cross-examination by defense counsel, Mrs. Bolaños indicated she did not provide a detailed description of the face of the assailant because he did not have any outstanding features, nothing remarkable, no scar, no particular shape of the nose she could notice. The suspect was not the kind of individual that she would see and she would cross the street. He looked normal and fine. The individual did not look like an addict or a thug. Mrs. Bolaños indicated that, when she stared at the assailant while he was approaching her, she looked at the "whole package", to wit, the whole person including his face and the firearm he was carrying.

United States v. Salvi Benitez Avila
Criminal No. 05-381 (JAG)
Report and Recommendation
Page No. 10

Mrs. Bolaños described that, when she saw the assailant at the gas station opening the gate, he was at a distance of 1 to 2 meters more than the length from the witness stand of the Court room to the window facing O'Neill Street, to wit, 7 to 8 meters.

When questioned by defense counsel whether Mrs. Bolaños noticed that the individuals who participated in the line-up had painted beards and mustache, she indicated it was the first time she heard that they were painted since she did not notice these were drawn or painted at the line-up. Mrs. Bolaños testified she was not aware that the other persons who participated in the line-up, along with the suspect, were police officers until she found out during the evidentiary hearing. All participants were similar in weight and built expect one who had a heavier set than the suspect.

## ANALYSIS

In considering defendant's request to suppress the witness' identification at the line-up as the individual who perpetrated the robbery, in <u>Foster v. California</u>, 394 U.S. 440, 89 S.Ct. 1127, 1128 (1969), the Supreme Court held "the conduct of identification procedures may be so unnecessarily suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law." Still, undue suggestiveness alone does not require suppression; rather, a court must consider "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *See* <u>Neil v. Biggers</u>, 409 U.S. 188, 199, 93 S.Ct. 375, 382 (1972).

In <u>Biggers</u>, the Supreme Court held that the factors to be considered in evaluating the likelihood of misidentification include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior

United States v. Salvi Benitez Avila
Criminal No. 05-381 (JAG)
Report and Recommendation
Page No. 11

description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.  *Id.* at 199-200, 93 S.Ct. 375. Thomas v. Varner,  428 F.3d 491, 503 (3d Cir. 2005).

Similarly, the Court of Appeals for the First Circuit in Judd v. Vose, 813 F.2d 494, 498 (1st Cir.  1987) affirmed that identification based on an in-court eyewitness identification following a pretrial photographic identification must be set aside "if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *See* Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971 (1968).  However, even if the pretrial photographic identification procedure was impermissibly suggestive, identification testimony will not be excluded if the identification otherwise possesses sufficient aspects of reliability.  *See* Manson v. Braithwaite, 432 U.S. 98, 113-14, 97 S.Ct. 2243, 2252-53 (1977); Neil v. Biggers, 409 U.S. at 199.

In the instant case, upon the evidence developed at the hearing before the undersigned Magistrate Judge, credibility determinations of the testimony of all witnesses presented, who were not impeached or contradicted by defendant's submissions, there was no indicia of suggestive identification during the line-up proceedings.  Once suggestive identification is present, then the court examines if under the totality of the circumstances the identification was reliable.  We need not ponder at this second step since suggestiveness was not evidenced nor established by herein defendant.  *See* United States v. Guzmán Rivera, 990 F.2d 681, 683 (1st Cir. 1993) (determining if the identification procedure used is not impermissibly suggestive, the Court need not address whether the identification was nevertheless reliable).

Nonetheless, in an abundance of caution, this Magistrate Judge nevertheless determines under the Bigger's factors for finding reliability, and the undisputed evidence at the hearing presented through the testimonies of witnesses, the identification in the instant case would also be considered reliable.  The victim had ample and clear opportunity to see her assailant; they had a face to face confrontation; there was a reasonable time span while both the victim and the defendant were eye to eye; the description provided by the victim was reasonably adequate; there is certainty that the victim identified the defendant without doubts at a properly conducted line-up proceeding; and no issue has been presented to diminish identification because of the time span between the robbery and the identification that was conducted.  All these factors significantly favor the existence of reliability as to the identification of defendant and would not favor any grounds for suppression.   Only identifications that are tainted because of circumstances **that give rise to a very substantial likelihood of irreparable misidentification** would be subject to suppression under due process concerns.  Simmons v. United States, 390 U.S. at 384; Bouthot v. United States, 878 F.2d 1506, 1514 (1st Cir. 1989) (emphasis supplied).[2]

Moreover, we note the alleged suggestive factors mentioned by the defense as grounds to suppress (shiny shoes, "pencil painted" facial hair, and differences in physical appearance) were not suggestive as demonstrated by the undisputed evidence presented at the evidentiary hearing. Mrs. Bolaños testified she did not look at the shoes of the members of the line-up and

---

[2]   The findings of the court after a hearing on a pretrial motion to suppress are binding unless they are clearly erroneous. United States v. de Jesús-Ríos, 990 F.2d 672, 677 (1st Cir.1993). United States v. Hernández-Rodríguez, No. 05-1121 slip op. (1st Cir. April 6, 2006) (credibility determinations in a report and recommendation should not be rejected by the Court without hearing the evidence examined by the Magistrate Judge).

there is undisputed testimony all the participants wore white covers over their shoes.   In addition, Mrs. Bolaños testified she did not notice the facial hair of the members of the line-up nor that it was "painted."  Furthermore, Mrs. Bolaños testified all participants in general had a similar weight and built, fact which was corroborated by defendant's wife who testified all the participants of the line-up resembled Salvi.

In addition, the alleged inaccuracy between the first information given by Mrs. Bolaños of the assailant on August 4, 2005 and the one given five days afterwards on August 9, 2005 is of little importance under the totality of the circumstances.  The truth of the matter is that, regardless of whether Mrs. Bolaños identified defendant as shorter than his actual size and with a skin color other than the one he claims, it is uncontested Mrs. Bolaños positively and without a doubt identified defendant at a properly set line-up.  Mrs. Bolaños was not induced by any suggestive factors nor was she tainted in any way.  Defendant has failed to show otherwise.

Additionally, since only under extraordinary circumstances identification evidence should be withheld from the jury, and there are no such circumstances herein present, it certainly is for the jury in this case to weight identification of this defendant.  Manson v. Brathwaite, 432 U.S. at 116.

In view of the foregoing, it is recommended that defendant's Motion to Suppress be DENIED.

## CONCLUSION

Upon considering the evidence presented at the evidentiary hearing through the testimonies of witnesses, the complete lack of suggestive identification at the line-up or at the in-court proceedings held before this Magistrate Judge, as well as the totality of the circumstances

United States v. Salvi Benitez Avila
Criminal No. 05-381 (JAG)
Report and Recommendation
Page No. 14

in the instant case, it is recommended that defendant's   Motion to Suppress Out-of-Court

Identifications (**Docket No. 51**) be DENIED.

IT IS SO RECOMMENDED.

The parties have ten (10) days to file any objections to this report and recommendation.

Failure to file same within the specified time waives the right to appeal this order.   Henley

Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792

F.2d 4 (1st Cir. 1986).  *See* Paterson-Latch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d

985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role

reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial

hearing, and save its knockout punch for the second round").

San Juan, Puerto Rico, this 5th day of May of 2006.

> **S/CAMILLE L. VELEZ-RIVE**
> **CAMILLE L. VELEZ-RIVE**
> **UNITED STATES MAGISTRATE JUDGE**